**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARIO RODRIGUEZ, *#351-043*, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. CCB-19-2683 |
| WEXFORD HEALTH SOURCES, INC., HOLLY PIERCE, | * | |
| | * | |
| Defendants | | |

***

**MEMORANDUM OPINION**

Self-represented plaintiff Mario Rodriguez, an inmate presently incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, brings this civil action pursuant to 42 U.S.C. § 1983 against Wexford Health Sources, Inc. ("Wexford") and Holly Pierce, N.P.[1]  ECF No. 1. In his verified complaint, plaintiff alleges negligence and a violation of his constitutional rights arising from defendants' alleged failure to provide timely and adequate medical care at NBCI. *Id.* He seeks declaratory and injunctive relief, as well as compensatory and punitive damages. *Id.* at 7-8.

On January 13, 2020, the Wexford Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 18), and on January 27, 2020, Pierce similarly filed a Motion to Dismiss or Alternatively for Summary Judgment (ECF No. 20).[2]

---

[1] Wexford was the contracted medical provider for inmates in the Maryland Department of Public Safety and Correctional Services until December 31, 2018. Beginning January 1, 2019, Corizon Health replaced Wexford, and defendant Pierce continues to provide medical services on behalf of Corizon. Thus, to the extent plaintiff raises claims regarding events that took place before January 1, 2019, his claims are against Wexford and Pierce (collectively, the "Wexford Defendants"). To the extent he raises claims regarding events that took place on or after January 1, 2019, his claims are against Pierce.

[2] Two weeks prior, on January 13, 2020, Pierce filed a Motion for Extension of Time. ECF No. 17. That motion shall be granted, *nunc pro tunc*.

Plaintiff was informed by the court, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that the failure to file a response in opposition to defendants' motions could result in dismissal of the complaint. ECF Nos. 19, 21. Plaintiff responded to both motions.[3] ECF Nos. 23, 30.

A hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, defendants' motions, construed as ones for summary judgment, will be granted.

**Background**

Plaintiff states that on December 19, 2006, he was involved in a serious car accident from which he suffered lateral and vertebral fractures, broken ribs, hemothorax, pneumothorax,[4] scapular fracture, and scalp laceration. Complaint at 3, ECF No. 1. He underwent numerous surgeries and was discharged with a neck brace, back brace, wheelchair, and a prescription for Oxycontin. *Id.* at 3-4. A year later, he was incarcerated and in 2008, was transferred to NBCI. *Id.* at 4.

While at NBCI, plaintiff suffered from chronic back pain and was self-medicating with

---

[3] On February 6, 2020, plaintiff filed a response (ECF No. 23) opposing the Wexford Defendants' motion, to which the Wexford Defendants replied (ECF No. 24). On March 16, 2020, plaintiff filed an additional response (ECF No. 25), which the Wexford Defendants moved to strike as an impermissible surreply (ECF No. 26). Anticipating that the court could construe plaintiff's additional response as an opposition to Pierce's motion, Pierce filed a reply. ECF Nos. 27, 28, 29. On May 4, 2020, plaintiff filed a response clearly intended to be in opposition to Pierce's motion. ECF No. 30. Defendants then filed motions to strike that response as an impermissible surreply. ECF Nos. 31, 32.

Based on the dates and content of plaintiff's pleadings, it appears that the additional response filed on March 16, 2020 was a surreply. Therefore, the Wexford Defendants' first Motion to Strike (ECF No. 26) shall be granted. As it is clear that plaintiff's May 4, 2020 filing was a response to Pierce's motion, the Wexford Defendants' second Motion to Strike (ECF No. 31) and Pierce's Motion to Strike (ECF No. 32) shall be denied.

[4] Hemopneumothorax is a combination of two medical conditions: pneumothorax and hemothorax. Pneumothorax, which is also known as a collapsed lung, happens when there is air outside the lung, in the space between the lung and the chest cavity. Hemothorax occurs when there is blood in that same space. *See* https://www.healthline.com/health/hemopneumothorax (last visited September 17, 2020).

"any pain reliever that he could get his hands on." *Id.* In 2017, his pain worsened, and he placed several sick call slips to the medical unit. *Id.* Plaintiff claims that as of August 2019, he had submitted approximately 10 sick call requests but was only seen four times, either by a registered nurse or licensed practical nurse, who could only prescribe Tylenol/Motrin and referred him to Nurse Practitioner ("NP") Holly Pierce each time. *Id.* at 4-5. Despite the referrals, plaintiff states that he never saw NP Pierce. *Id.* As a result, he does not know whether he will suffer irreparable harm "such as arthritis." *Id.*

In support of their motions, defendants have submitted copies of plaintiff's medical records for the three years preceding the filing of the complaint. The records reflect that plaintiff is a 31-year old male with a medical history significant for back, neck, and head pain, and a mental health history of depression with psychosis. *See generally* Wexford Medical Records, ECF No. 18-4.

On July 10, 2016, plaintiff submitted a sick call slip complaining he had pain in his forehead and the front of his face. *Id.* at 2. Three days later, he was seen at nurse sick call, where he was examined and given Ibuprofen for pain. *Id.* at 3. On July 21, 2016, plaintiff refused to report to the medical unit for his annual physical exam. *Id.* at 4.

On September 15, 2016, the medical staff received a sick call slip from plaintiff dated August 14, 2016, again complaining of pain in his head, face, and back. *Id.* at 5. On September 16, 2016, plaintiff was seen at nurse sick call, where he was examined and found to be in no acute distress. *Id.* at 6. Plaintiff was instructed to apply cold compresses to the affected area, and he was referred to a provider. *Id.* at 7-8.

As a result of the referral, plaintiff was seen by NP Krista Bilak on September 26, 2016. *Id.* at 9-10. NP Bilak noted that plaintiff had been prescribed multiple medications without improvement, and she informed him that his pain would remain chronic. *Id.* On examination,

plaintiff was in no apparent distress. *Id.* He was given Excedrin Migraine for pain and directed to follow up if his condition worsened or did not improve within 30 days. *Id.*

Plaintiff did not submit another sick call regarding his chronic pain until December 14, 2016. *Id.* at 12. On December 16, 2016, plaintiff was seen at nurse sick call, at which time no signs or symptoms of acute distress were noted. *Id.* at 13-14. Plaintiff was told to apply warm compresses to the affected area and to submit a sick call if the pain persists. *Id.* At that time, plaintiff's prescription for Excedrin Migraine was still active. *Id.*

On January 13, 2017, Plaintiff submitted a sick call slip complaining of severe headaches that resulted from "trauma . . . received while incarcerated." *Id.* at 15. At the resulting sick call visit on January 17, 2017, plaintiff rated his pain at 8 out of 10. *Id.* at 16-18. He was referred to a provider for a follow-up, and an x-ray of his facial bones was ordered. *Id.* The attending nurse noted that plaintiff's prescription for Excedrin Migraine was still active, and he advised plaintiff to place a sick call if his symptoms did not subside or became more severe. *Id.*

On January 23, 2017, an x-ray of plaintiff's nasal bone was performed, revealing age indeterminate nasal bone avulsion. *Id.* at 19. On January 30, 2017, NP Bilak reviewed the x-ray results with plaintiff. *Id.* at 20. During that visit, plaintiff reported daily headaches and nasal secretions with intermittent bloody secretions. *Id.* at 20-21. NP Bilak ordered a CT scan of the face and prescribed Naproxen 500mg through May 28, 2017, for pain. *Id.*

On March 8, 2017, plaintiff had a maxillofacial CT without contrast. *Id.* at 22. According to the radiologist, there was no evidence of fractures, the paranasal sinuses were clear, and the soft tissues were unremarkable. *Id.* On March 12, 2017, NP Bilak saw plaintiff during a scheduled visit and informed him that his CT scan was normal. *Id.* at 23.

On August 18, 2017, plaintiff submitted a sick call slip complaining he had pain on the left

side of his head and was losing sensation on the left side of his face. *Id.* at 26. He was seen at nurse sick call the following day, at which time there were no signs or symptoms of acute distress. *Id.* at 27-28. Plaintiff was referred to a physician and directed to place a sick call as needed. *Id.*

From the medical records, it does not appear that plaintiff saw a physician as a result of the referral. Plaintiff, however, did not submit another sick call slip until May 20, 2018, when he complained of chronic pain in the left side of his head. *Id.* at 29. On May 22, 2018, plaintiff submitted a sick call slip complaining of pain in his spine and neck. *Id.* at 32. On May 23, 2018, plaintiff was seen at nurse sick call. *Id.* at 30-31. Upon examination, plaintiff had no swelling, loss of motor skills, or vision changes. *Id.* He was advised to take Motrin or Tylenol for headaches, apply cold compresses, and to report back if symptoms changed. *Id.*

On October 2, 2018, plaintiff was seen at nurse sick call for medical evaluation after an altercation, but he refused to be examined. *Id.* at 33. On October 10, 2018, plaintiff submitted a sick call slip complaining of pain in his spine. *Id.* at 34. On October 12, 2018, he was seen at nurse sick call, where it was noted that he had trouble walking. *Id.* at 35-36. Plaintiff was referred to a provider for evaluation and treatment as it did not appear that his condition was responding to protocol, and the mechanism of injury suggested additional trauma. *Id.*

Two days later, on October 14, 2018, plaintiff submitted another sick call slip complaining of pain in the left side of his head. *Id.* at 37. On October 16, 2018, plaintiff was seen at nurse sick call, where he was given Tylenol and continued to be referred to a provider. *Id.* at 38-39. On October 26, 2018, plaintiff submitted a sick call slip, again complaining of pain on the left side of his head. *Id.* at 40. On October 30, 2018, he was seen at nurse sick call, at which time it was noted that the provider visit was scheduled for November 9, 2018. *Id.* at 41-42.

There is no record of a medical visit on November 9, 2018. Plaintiff placed several sick

calls from November 2018 to January 2019 with complaints of constipation, but he failed to report to the medical department for most of the resulting sick call visits. *See* Pierce Medical Records at 50-55, ECF No. 20-5.

Plaintiff did not submit sick call requests regarding chronic back and head pain until February 11 and February 19, 2019. Pierce Medical Records at 22-23, ECF No. 20-4. During a sick call visit on February 22, 2019, plaintiff reported having a strain-like pain with periods of sharp pains in his lower back. ECF No. 20-5 at 60. The attending nurse consulted with NP Katrina Opel, who ordered Tylenol and muscle rub for three months. *Id.* Plaintiff was also educated about warm compresses and the importance of stretching and warming up. *Id.*

On June 9, 2019, plaintiff submitted a health care request complaining of chest pain, but he failed to appear for his sick call appointment. ECF No. 20-4 at 3, 19. On June 20, 2019, plaintiff was evaluated in the medical unit following his involvement in an altercation. ECF No. 20-5 at 64. No injuries were noted, and he appeared to be in no distress upon examination. *Id.*

On June 27, 2019, plaintiff submitted a sick call request complaining of hand pain. ECF No. 20-4 at 18. On July 3, 2019, he was seen by a nurse who noted some swelling and bruising on plaintiff's knuckles and provided Tylenol for pain. ECF No. 20-5 at 67-68. The nurse also referred plaintiff to a provider and contacted NP Pierce, who in turn ordered an x-ray. *Id.*

On August 12, 2019, plaintiff submitted another sick call request complaining of hand pain but failed to appear at the resulting appointment. ECF No. 20-4 at 2, 17. He submitted another health care request repeating the same complaint on August 14, 2019, followed by complaints of chronic neck, back, and head pain on August 15, 2019. *Id.* at 14-15. On August 16, 2019, a nurse saw plaintiff for his complaints of hand pain and subsequently consulted with NP Pierce, who ordered a hand x-ray, a one-month supply of Motrin, and a follow-up appointment. ECF No. 20-

5 at 72. The nurse did not note that plaintiff had pain in his neck, back, or head at that time. *See id.* An August 20, 2019 x-ray of plaintiff's hand showed no abnormality. *Id.* at 79.

On November 13, 2019, plaintiff filed a sick call request complaining of pain on the left side of his head, losing vision in his left eye, and losing control of his left arm and leg. *Id.* at 83. On November 17, 2019, he was told to resubmit the request properly by using a new sick call form and placing it in the sick call box. *Id.* On November 22, 2019, plaintiff resubmitted his request but refused to be seen during the resulting visit on November 25, 2019. *Id.* at 81.

On January 13, 2020, NP Pierce saw plaintiff for complaints of left temporal pain. *Id.* at 84-85. Plaintiff requested x-rays of his head and neck and reported that he was otherwise well. *Id.* On examination, plaintiff exhibited no abnormalities in his neck and back, including swelling, abnormal range of motion, gait abnormality, or complaints of tenderness. *Id.* NP Pierce prescribed Ibuprofen for pain, ordered x-rays of his skull and cervical spine, and directed plaintiff to follow up in one week. *Id.* On January 24, 2020, x-rays of plaintiff's cervical spine and skull were performed, and neither revealed any abnormalities. *Id.* at 86-87.

NP Pierce states that she has never refused to see plaintiff, nor did she deny him appropriate medical treatment for any medical concerns or symptoms. Decl. of Pierce at ¶¶ 6, 22, ECF No. 20-3. NP Pierce was not involved in scheduling medical appointments and she was not aware of any oversights in the scheduling of plaintiff's appointments with higher-level medical providers before he filed his lawsuit. *Id.* According to NP Pierce, the course of plaintiff's medical treatment was not affected by any perceived delay. *Id.* at ¶ 22. Moreover, plaintiff was not harmed by any delay in treatment, as x-rays have ruled out any degeneration or injury. *Id.*

In his responses to defendants' motions, plaintiff reiterates his assertion that he has not received adequate medical care at NBCI and, in particular, from NP Pierce. Response to Wexford

Defendants, ECF No. 23.  He notes that provider referrals were submitted on October 12, 2018 and October 30, 2018, but NP Pierce never responded to either referral.  Response to Pierce at 3, ECF No. 30.  Plaintiff claims that, as a result, he was subjected to unnecessary pain.  *Id.* at 4.  As relief, plaintiff requests pain medication, muscle relaxers, a back brace, physical therapy, and bottom bunk and bottom tier assignments.  ECF No. 23 at 6, 8.

## Standard of Review

Defendants' motions are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Hous., LLC v. The City of Salisbury, Maryland*, 672 F. App'x. 220, 222 (4th Cir. 2016) (per curiam).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Here, defendants filed motions titled as motions to dismiss or alternatively for summary judgment and submitted additional materials in support. Plaintiff also filed exhibits in support of his claims. Therefore, plaintiff was on notice that the court could treat defendants' motions as ones for summary judgment and rule on that basis. Accordingly, the court will review plaintiff's claims under the Rule 56(a) standard.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). And, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). Submissions by *pro se* plaintiffs must be liberally construed.

9

*See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But the court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## Analysis

I. **Eighth Amendment Claim**

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant, or the defendant's failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious

10

medical condition. *See Farmer*, 511 U.S. at 839-40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Here, even assuming that plaintiff's condition while at NBCI was sufficiently severe that it created a serious medical need for Eighth Amendment purposes, the record does not support a finding that defendants acted with deliberate indifference to that need. In the three years preceding the filing of the complaint, plaintiff filed 18 sick call requests and was seen by a nurse each time except in three instances where plaintiff failed to attend the appointment. The nurses listened to plaintiff's complaints, examined him, and prescribed pain medication such as Ibuprofen, Tylenol, Motrin, Excedrin Migraine, and Naproxen. During six of the sick call visits, plaintiff was referred to, and seen, by nurse practitioners including NP Pierce.

Viewing the evidence in the light most favorable to plaintiff, there is no indication that

Wexford or NP Pierce ignored his complaints of pain. In the course of treating plaintiff, the medical staff ordered x-rays of his neck, hand, head, neck, skull, and cervical spine, as well as a CT scan of his face. With the exception of the nasal x-ray, which revealed an age indeterminate bone avulsion, the rest of the x-rays revealed no abnormalities. A subsequent CT scan of plaintiff's nose came back normal.

In his response, plaintiff claims that although he was referred to a provider on October 12, 2018, NP Pierce continuously refused to see him for an evaluation. Indeed, the record reflects that a provider appointment scheduled for November 9, 2018, did not take place. It does not appear, however, that plaintiff complained about the missed appointment, nor did he file any other sick calls regarding his chronic pain until February 2019. Thereafter, he was promptly seen by NP Opel, who ordered Tylenol and muscle rub.

Subjectively, the delay in seeing a nurse practitioner did not amount to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. *See Estelle*, 429 U.S. at 105-06. NP Pierce states that she is not involved in scheduling medical appointments and was not aware of any oversights in the scheduling of plaintiff's appointments with higher-level medical providers. In addition, it is unclear whether plaintiff was scheduled to see NP Pierce for that appointment rather than another medical provider.

Finally, to the extent plaintiff complains that he should have been given muscle relaxers, a back brace, physical therapy, and bottom bunk and bottom tier assignment, instead of hot or cold compresses and over the counter pain medication, his claim has no merit. As previously indicated, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir.1970)). Therefore,

plaintiff has not shown that defendants exhibited a callous disregard for his serious medical need, *see Estelle*, 429 U.S. at 105-06, and defendants are entitled to summary judgment on this claim.

## II.     Respondeat Superior

Plaintiff makes no direct allegations against Wexford. Instead, it appears that he seeks to hold Wexford liable for the actions of its employees. Likewise, plaintiff seeks to hold NP Pierce liable in her capacity as a supervisor. It is well established, however, that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no respondeat superior liability under § 1983). Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Plaintiff has failed to plead or demonstrate sufficient facts showing supervisory

indifference to, or tacit authorization of, any misconduct by Wexford's employees or NP Pierce's staff. As discussed above, plaintiff failed to show that his Eighth Amendment rights were violated in connection with his medical care. Accordingly, he has necessarily failed to demonstrate that defendants authorized or were indifferent to any such violation.

Moreover, plaintiff's assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See id.* ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse."). In his pleadings, he acknowledges that he was routinely seen by nurses at sick call visits and was further evaluated by other nurse practitioners upon referral. Therefore, defendants are entitled to summary judgment on this ground as well.

**III.    Negligence Claims**

To the extent that plaintiff also brings medical negligence claims, the court declines to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c) (stating that a district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction."). When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction. *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)). These claims are dismissed without prejudice.[5]

**IV.    Punitive Damages**

---

[5] To sustain a medical malpractice claim in state court, plaintiff must adhere to the Maryland Health Care Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.*, which requires a plaintiff to file medical negligence claims with the Health Care Alternative Dispute Resolution Office prior to filing suit when the claim for damages exceeds the jurisdictional amount for the state district courts. *See id.* at § 3-2A-02; *see also Roberts v. Suburban Hosp. Assoc., Inc.*, 73 Md. App. 1, 3 (1987).

14

Punitive damages are allowed in an action under § 1983 when the defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *See Smith v. Wade*, 461 U.S. 30, 56 (1983). There is no evidence on the face of the complaint, and plaintiff has offered none in rebuttal to defendants' motions, that the conduct alleged was the result of reckless or callous indifference to his federally protected rights. As such, plaintiff is not entitled to punitive damages.

## V.     Injunctive Relief

Plaintiff's request for injunctive relief is also denied. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A party seeking a preliminary injunction bears the burden of demonstrating: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346-47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

As previously discussed, plaintiff has failed to demonstrate the likelihood of success on the merits and for this reason alone his request for injunctive relief fails. Moreover, plaintiff has not demonstrated that he is likely to suffer irreparable harm or that the balance of equities tips in his favor. Thus, his request for injunctive relief is denied.

**Conclusion**

Defendants' motions to dismiss or alternatively for summary judgment, construed as motions for summary judgment, are granted. A separate Order follows.

__9/18/20_____ _____/S/_____
Date Catherine C. Blake
United States District Judge